Good morning. I'm Patti Risburger for the appellant Kate Connell. And Ms. Connell was employed and still is employed actually by the Multnomah County Department of Community Justice. And she had an impeccable record beginning in 19, with her employment beginning in 1988. Until the year 2000, when she was terminated for not signing a document, which she was not allowed to read. Well, she wanted to read the whole thing. What she didn't want to sign, though, was the little segment that she did read, which was, we're not going to fight anymore. She read that. Correct. She read that. But she was not allowed to read the entire settlement. That's true. I want to make sure that we touch on every single one of the claims. First, we have the final policymaker argument. The district court ruled that Elise Claussen was not a final policymaker. And there's significant evidence to the contrary. First of all, Ms. Claussen concedes that she's responsible for establishing the goals and objectives of the department. That's both in her affidavit. It's also on the very first page of defendant's responsive memorandum. But wasn't her decision to terminate Ms. Connell, in the end, overridden? It was overridden, but the damage was not. I understand that, which is why we still have a claim. But the fact that the decision to terminate it was overridden suggests to me that the intermediary wasn't the final decisionmaker. With respect to her back wages, she was the final decisionmaker. Elise Claussen, once she made that decision, it was never the decision to take away the wages. Those wages were never reinstated. So she, in fact, was the final decisionmaker. The final decisionmaker because she was the last person to make the decision? Or could that decision have been appealed to the Board of Supervisors? Is that what they're called in Multnomah County? The actual procedure, what happened was that Elise Claussen made the decision. It was then appealed to a hearings officer. From that point, it was then appealed to the Merit Council. Is that a county entity or a state? The Merit Council is a county entity, is my understanding. I guess where I'm getting a little confused, Ms. Risberger, is my understanding was that this is a county department within the general supervision and control of the Board of Supervisors, right? So why wouldn't, for purposes of a 1983 action, why wouldn't we declare that it is the Board that is the final decisionmaker for purposes of Section 1983 liability? For several reasons. Number one, that's not what happened here. Not what happened? What evidence was before the district court, I guess, is really my question. What evidence was before the district court was, first of all, the concession by Elise Claussen that she was responsible for establishing the goals and objectives of the department. In addition, the Multnomah County Home Rule Charter, at Excerpt of Record 32, page 4, provides that the county chair has delegated administrative authority to department directors. But the fact that authority has been delegated doesn't make the manager the final policymaker, does it? It doesn't because the charter says that the department director acts in the same capacity as the chair. Well, that's true of any delegation, but let me ask the question from a different perspective. Could your client have appealed the decision that she is seeking to sue on to the chair? No. There's no way to get to the chair? No. And that's because she has to go through this hearing officer? And that's exactly the problem. They have set up a system in which you can't appeal to the chair, yet the chair is trying to say that the chair is the final policymaker. And, in fact, there isn't an affidavit in this case by the chair. But this is a Section 1983 action. It's not a respondeat superior statute. So it does make a difference for purposes of the federal claim, doesn't it? I'm not sure where you're going with that. Well, I guess where I'm going is you want to be able to sue the supervisor, or in this case the final decision maker, as you're alleging, without complying with the federal requirement that the only way you get to the final policymaker is in support of a Monell claim, that this adverse action that was taken against your client is as a result of some official policy or practice that was condoned by the County of Multnomah. Otherwise you don't get to just sue sort of anybody in the chain. That's my understanding of the law. So is your question focused solely on the individual liability of Elise Clauston, or are you talking about municipal liability? Well, I guess I'm asking both. I mean, under 1983, you've got to show either a direct violation by Elise Clauston, or you've got to go after the policymaker. And I thought your argument was that you're going after her on a theory that she's the final policymaker. We're going after her on the theory that she acted under the color of state law by terminating employment. And I don't think that the county has any dispute that all we need to show for municipal liability is that there is a final policymaker made the decision, or there's a custom practice or policy. But their argument is she's not a final policymaker, and you can say she is. And therefore there's no municipal liability. But they go on to continue their argument with respect to Elise Clauston, because clearly she was the one that deprived my client of her place under the plan. So even though she's not a final policymaker, you still have your cause of action against her. Correct. Assuming you can make out the cause of action. Correct. Okay. Now, I just want to touch on some of the additional evidence indicating that she is a final policymaker. She testified, and this is at Excerpt of Record, page 39, that she made the ultimate decisions regarding the method of settling employment disputes. She also made ultimate decisions regarding pay increases. She also made ultimate decisions regarding evaluation of employees' performance vis-à-vis goals and objectives of the department. If somebody is establishing goals and objectives of the department, what is that other than establishing policy? Now, interestingly, the county has cited at, I believe, Supplemental Excerpt of Record 120, the Mintner case. And if you read a portion of that case, and I can't cite to the exact page of it, but a department director was found to be a final policymaker, and some of the same evidence in that case is present here. If you look at the termination letter, it was a copy of that was sent to Elise Claussen. It wasn't sent to the chair of the county. So I think there's substantial evidence. I've also cited several cases in which the court has sent back down to the district court cases of mixed genuine issues of material fact as to whether or not it's really clear that Elise Claussen, that the department director was or wasn't a final policymaker. So we're relying on all that evidence, and I think it's substantial. And I don't think you can say in this case, as a matter of law, that Elise Claussen was not a final policymaker with respect to making employment decisions, particularly termination decisions. And if you look at actually what happened, there was, despite the merit counsel saying the termination is rescinded, what happened was the back wages were never reinstated. And despite the merit counsel saying the termination is rescinded, look at the timing of when that happened. That happened 10 months later. So there's a liberty interest at stake here, 10 months of not being allowed to work. Okay. Now, can we move on to whether Ms. Connell's rights have been violated? That is to say, that's necessary for a holding of liability against Elise Claussen, and of course, assuming that we agree with you about the final decisionmaker, against the county as well. Can you help me understand why it was wrong for her to be terminated? In a nutshell, the argument as to why it's right for her to have been terminated is, there was a perfectly lawful order that she disobeyed, and they warned her that she would be disciplined for it. She did not sign the agreement, and she was disciplined. What's wrong with that? Three, possibly four wrongs with that, major wrongs, constitutional wrongs. First, procedural due process. Pre-termination, violation of procedural due process, because she was never told that termination was a proposed course of action against her. Was it necessary that she be told that she be terminated, or was it merely necessary that she be told that some sanction is going to be applied? Under the Laudermill case, it was necessary that she be told of the proposed action against her, and particularly where she asked. Let me ask you this more specifically. The proposed action against her, does that mean that there will be a disciplinary action that you're not going to like, or does it mean we're going to suspend you for 120 days, and if you say 120 days, you can't later suspend her for 125 days? I mean, how specific does the notification of what bad thing can happen to you have to be under Laudermill? Well, the proposed form of discipline has to be identified in some way other than that, more so than in no way. But if she was told that her failure to sign will constitute an act of insubordination, to follow up on Judge Fletcher's question, what more does she need to be told that, and if you refuse to sign it, we're going to fire you? Even assuming that that proposition is correct, that something has to be said, in response to the specific question, what will happen, that clearly opens the door to, it clearly puts the county on notice that she's not even sure that something will happen. What will be the consequence? Will you just simply slap my hand? How can somebody respond to a proposed course of action without knowing what that is? And I think Laudermill is very clear on this. But there's a fair amount of evidence that she knew. Meaning she testifies that the night before, she's clearing out her desk, because she anticipates that she's going to be fired. The night before, she's clearing out, well... She's tidying up her computer. I mean, she's getting ready to leave because she knows the hammer's coming down. But the hearing occurred before that. So-called hearing, or the request, and it can't really be called a hearing. What they're trying to say is the hearing happened before that. After she attempts to speak with Michael Haynes additionally, and he won't speak to her, she starts thinking, I might get terminated. But she's never told. And that's why we're here. That's one of the major reasons we're here, the pre-termination due process requirement, that you be told what the proposed discipline will be. Let me ask you, am I correct in reading the record? Were there six meetings with your client? No. There were conversations about the settlement agreement. Well, yeah, six conversations about you've got to sign this thing. No. There was only one meeting in which she was directed to sign the settlement agreement. Prior to that, she was simply told, the first couple, in vague terms, there's going to be some agreement that you and Tom Grinnell need to sign. She asks, can I see a draft of that beforehand, before I have to sign? Sure, you can see a draft. They then show her this, and she wants to change some of the wording. Most importantly, what she wants to do is talk to her attorney about this. And if you look at the record, on September 25th, when she's handed this document, when she's actually given the document, and wants to take it to her attorney, I believe it was September 25th, and then she gets terminated on October 11th. Between that period of time, what happens is her attorney is attempting to contact Agnes Soule, and her attorney tells her, you know, Agnes just isn't calling me back. So, first of all, the negotiation on this agreement was going on during the time that she was terminated. In fact, the letter from Ms. Connell's attorney to Agnes Soule, specifically asking to see this document. But this document, you mean the overall? The overall document. Not just the paragraph that she doesn't want to sign, but the overall document. No, now I'm talking about the overall document. That request wasn't made until after the termination. That letter went in the mail as the termination was literally occurring. Now, is there an obligation, independent of a sort of a notification of, if you don't sign, something really bad is going to happen to you. Is there an obligation on the part of the county or on the part of Ms. Blossom to negotiate? Can't they just say, you know, sign it or else? Well, the point of that is it's certainly in bad faith to say, you're going to be able to see a draft, and we'd like your input, but then not. Now, did they say, we'd like your input? Well, certainly you can infer that, and we're on summary judgment here. Well, we'll see a draft. Here it is. It's a draft form. Then it becomes final, and we'd like you to sign it. What I'm after, I guess, is two things. One of them is sort of the idea of notice, which I'm not quite comfortable with. I think under Laudermill we should get comfortable with that one. Because Laudermill specifically said- No, I understand. I'm not comfortable either way. I'm having trouble with that issue. So it may be that if they say you can see a draft, there may be some hint there. This isn't a take it or leave it. You sign it or you can't. But I don't think there was any obligation independent of Laudermill in that sort of notice thing for them to allow her to see a draft that's subject to negotiation. Well, I think we started this based on the question regarding weren't there six meetings. Well, there weren't really six meetings. Directing her to sign it. During those meetings, what was being discussed is the merits of Mr. Grinnell's claim vis-a-vis the Landis injunction in which the county had been found guilty of depriving males of promotional opportunities, white males. Now, these were issues that were being discussed because Ms. Connell was Tom Grinnell's supervisor. So these meetings had other points to them other than just handing my client a document. So the document wasn't handed to her for her to give to her attorney, to show to her attorney, even though she was allowed to look at it at first on one of those meetings. They didn't give it to her. Then at another meeting, they gave it to her to give to her attorney. And at no time did they agree to allow her to see the entire document. Okay, so the concern here is not over what she was being asked to sign, but that she wanted to see the larger context in which... No, wrong. The concern was also over what she was being asked to sign. Well, she didn't want to sign it. I understand that. So I need more about your question. I guess what I'm trying to understand here is on the last meeting, they said basically, here is the agreement that we want you to sign, correct? And then she said, well, what happens if I don't sign it? And she apparently was told that that could be considered an act of insubordination. She did not refuse to sign the document. Well, she didn't sign it, and she asked what would happen if she wouldn't, right? What she said was, I am not refusing. I want to talk to my attorney. And I want to know what would happen if I don't sign it. Okay, and she was told the answer to that question? No. That it would be considered an act of insubordination. She wasn't told that? That's not the proposed disciplinary action. That's simply a title in which different forms of discipline... Up to and including termination apparently were known to your client. So I guess we're getting back to the notice issue. And then she goes and she cleans out her office and cleans up her computer. I don't agree with that proposition, that up to and including termination were apparently known. Are you saying that your client didn't know she could be terminated for insubordination? She didn't know that that was something they were really considering. That's not my question. Did your client know that if a county employee was found to have engaged in an act of insubordination, that discipline including termination could follow? As a general proposition, I think she did know that. Okay. But that doesn't end the inquiry about whether the proposed notice of the charges against her... I understand your position. So in addition to the pre-termination lack of due process, there was, of course, the post-termination lack of due process. And the district court left that issue by simply saying, well, Elyse Claussen, even assuming she was biased, there's no evidence that the merit counsel was biased. Well, the merit counsel didn't take away Ms. Claussen's right to employment. Elyse Claussen did. The merit counsel reinstated her right to employment. So how can the question, the issue be whether the merit counsel was biased? And there was substantial evidence, even though the county, I don't think, got into this, substantial evidence that Elyse Claussen was, in fact, biased. She is the one that refused to comply with the hearings officer's recommendation that Ms. Claussen be reinstated. She also refused to give Ms. Connell her back wages. And she was also involved in the Landis injunction and the threat of what this Landis injunction and Mr. Grinnell's bully complaint represented. Elyse Claussen knew that she could be sued by Grinnell individually. I think we've got your argument in hand, and I'd like to have some time for rebuttal. So let's hear from the other side, and then we'll hear from you again. Good morning. May it please the Court, my name is Jenny Morf, and I represent Multnomah County and Elyse Claussen in this matter. Today we're going to be asking that this panel affirm the order of the lower court for several reasons. First and foremost, we have a claim under Section 1983 that Multnomah County, as a municipality, should be held liable for violations of due process and violations of the First Amendment. In order to determine if there's municipal liability, we have to look closely at Monell liability and the purpose of Monell liability, and in those cases that it's progeny, we find that you can only have municipal liability in three circumstances. One, when there's an official policy or practice which violates an individual's constitutional rights. Second, when a final policymaker violates the constitutional rights of an employee. And third, when a final policymaker ratifies. Here we're looking at the second prong, which is a final policymaker violates the constitutional rights of an individual, in this case, Ms. Connell. Well, who actually terminated her employment? Ms. Claussen terminated Ms. Connell's employment. Was she the final decisionmaker at the point of the decision that Connell was worrying about, the termination? Ms. Claussen was able to hire and terminate employees within her organization. Why wouldn't she be a final decisionmaker then? Well, Ms. Claussen is not the ultimate arbiter of whether or not individual employees can be terminated in the county. Instead, we have personnel rules which are created and adopted by the chair of Multnomah County. These are post-termination proceedings? Correct. So Claussen can say, you're fired, clean out your desk. That's correct. She can. And write if you get work. And then they can have the post-termination proceedings that ended up reinstating her. So she may have some damages, but they don't add up to very much. Not enough to hire all these lawyers. It's correct that Ms. Claussen does not make the final decision with regard to termination. But when we're looking at the final policymaker, we need to look at Hembower v. City of Cincinnati, and that's a Supreme Court case that says that even when an official has the ability to hire and fire, they are not the ultimate decisionmaker of employment policy unless they have created those employment policies and have the ability to change them. It is completely undisputed in this case that the ultimate policymaker for employment policy in the county is the county chair. And there's evidence in the record to show that the chair actually did adopt the personnel rules in effect at the time of Clannis' termination, and that's at supplemental exodus of the record 118. So that's what we're looking at when we're talking about official capacity or municipal liability. Now, even if there isn't municipal liability, plaintiff is still bringing a claim for individual liability against Ms. Claussen. And to that, we need to look directly at Ms. Claussen's involvement with either due process concerns or concerns related to the First Amendment. How do you respond to the argument that it was incumbent upon Ms. Claussen or someone else in authority to let Ms. McConnell know not merely that this would be regarded as a serious matter and would be regarded as a subordination, but among the various punishments contemplated, she could get fired as that last one? What obligation, if any, did your client have to say, and if you don't sign, we are going to fire you? Because I don't think that was ever said. Well, Ms. Connell disputes that that was said. So that would be an issue of fact. But I think that we're here on summary judgment. Excuse me? And we're here on summary judgment. Correct. So if that's a relevant dispute, we send you back. However. For purposes of now, let's just assume that it was set. Okay. Or excuse me, let's assume that it was not set. Right, that it was not set. And what we look at when we look at, we have the Matthews v. Harney County case, which is a Ninth Circuit 1987 case, and that says that the employee must be advised of dependency of disciplinary action, notice of charges, and the evidence supporting those charges. In this case, there can be no doubt that plaintiff was aware that disciplinary. . . That case assumed that everybody understood what was going to happen. That just goes to proving facts. That doesn't go to punishment or consequence. So plaintiff admitted that she was aware of the Personnel Rule 135 that says, Insubordination is cause for termination. She admits that she believed, and I quote, I was thinking they were probably going to terminate me. That's at Excerpt of the Record 101. Now, at what point is she thinking that? Excerpt 101 at 47. At that point, her supervisor called her and said that we need to set up a final meeting with you tomorrow to discuss. . . In other words, she finally says, in the stuff that we have here in the record, she finally says, you know, I began to think I was going to get fired. Absolutely. The day before it happens. Absolutely. Is there evidence in the record that she knew before, the day before it happened, that she was going to get fired? By her own statement, off the top of my head, I'm not sure, Your Honor. There's no doubt that she didn't. . . It wasn't too late by the time she figured out, hey, I'm going to get fired. That is to say, was the night cast. Absolutely not. There was a meeting scheduled for the next day on this very matter. She failed. She called in sick the next day. No, no, no, no, no, no. I'm after this. At 6 o'clock the night before, she says, you know, okay, I began to think I was going to get fired. And I started to clear out my desk and so on. And I have to meet the next morning at 8 o'clock. And I'd been told, and that tone of voice was so serious over the phone, if she'd come in the next morning at 8 o'clock and said, I'll sign, could she have saved her job? I think she absolutely could have saved her job. She would no longer have been in support. How do you know that? Well, there's testimony in the record from Ms. Clausen that, and I don't know the exact site of this, but to the effect of that what we needed her to do was to sign the document. And failure to sign the document would lead to serious consequences, the most dire consequences. Now, when the decision was made that we will fire her, that had been made when the phone call went to her, please meet with us tomorrow morning. No. That decision was going, I mean, the final meeting was her final opportunity to come to the table and to comply with the order that had been given to her. So there is no testimony. So with that, do we have evidence of what was said at that meeting? Did they say, sign it now, this is your last chance? She didn't show up. She called in sick. She never came to the office that day. I see. That's what you're saying. That's the call in sick time. So she never made that 8 o'clock meeting. She just didn't show up. That's correct, Your Honor. So we don't know what would have been said because there was no opportunity to say it. Right. She had an opportunity to respond to the charges against her, but she didn't take that opportunity. Well, this isn't really a charges against you case in the sense of is it true or not. It's do this or else. And the question is, when did she know the else? Well, it's clear that she knew from as an employee of the county since 1988, it's clear that she knew the personnel rules and the scope of possible discipline for insubordination. It's clear that she understood that there would be the most dire consequences. And, you know, at the very latest, the night before, she sends an e-mail that says, I believe I'm going to be terminated tomorrow at 8 a.m. There's something screwy about this case in the sense that I'm not sure I understand the motivations of all the players here. Why does she want to see the overall settlement agreement? I guess I can ask the other side, too. She asked for it and you say no. Why does she want to see it? Or maybe because you're in the position of no. Why don't you want to let her see it? Well, the final page of the settlement agreement included the exact dollar amount of the settlement. And because Ms. Connell was the supervisor of the individual who was being settled with, unless that agreement actually went forward, we didn't want that to be a matter of public record. Now, certainly once that document is signed, it would be. But you didn't say, oh, listen, we'll take the dollar amount out, but you can see everything else. You just said no, you can't see it. Well, in fact, on October 12th, which is the day before the termination letter went out, Ms. Soule, the county attorney, did speak to plaintiff's then attorney, who's a different attorney now, and she orally read to him the exact wording of the entire agreement and represented to him that there was no other information within the agreement that in any way related to Ms. Connell. So her attorney did have notice of everything that was in the agreement. Was that before or after the firing took place? That was before. That was before. If you look at S.E.R. 111, paragraph 8. So when we're talking about pre-termination, we need notice of the charges against you, opportunity to respond. And I think that it's very clear that Ms. Connell knew that failure to sign the agreement would be considered in subordination and that she was risking termination if she failed to do so. And she, in fact, did not sign the agreement. The next major issue to look at would be post-termination process. And under Laudermill, it's required that you have a meaningful hearing, and part of a meaningful hearing means an impartial decision maker. In this case, Ms. Connell claims that Ms. Claussen was somehow biased against Ms. Connell. Now, there's not a specific allegation of why or how Ms. Claussen was biased, except to say that she was involved in the earlier termination decision and along the way she did not support bringing Ms. Connell back into the workplace. However, there has to be some other evidence of animosity towards Ms. Connell. And there simply isn't. In fact, Ms. Claussen testified that she had no personal animosity against Ms. Connell. We have a presumption that reasonable people are going to act in an unbiased manner, and that's exactly what happened here. Now, notwithstanding Ms. Claussen's bias or unbiased, the most important factor here is that it's the merit counsel who was the arbiter of Ms. Connell's post-deprivation hearing. She received multiple hearings over multiple days. First, before a hearings officer, Ms. Claussen did make a decision in the middle, and then finally the merit counsel came in and made the final decision. Interesting to note that the hearings officer's original decision says, I uphold the finding of insubordination. However, under the circumstances, termination was too harsh and she should be given another opportunity to sign, and that's what ultimately happened. The merit counsel upheld the hearings officer's order and said, okay, well, we'll give her another opportunity to sign. If she doesn't sign, then the termination will be upheld. So in the end, it was the merit counsel who looked at all the evidence in the record and decided ultimately that she should be reemployed by Multnomah County, and she is, in fact, still employed today. What was the basis for saying she had to sign something without reading it or being subordinate? Most people would say something unfriendable to somebody and told them to sign something without reading it. I would. She was asked to sign the document and was given the portion of the document which specifically spoke to her. It was a small excerpt of an entire document and only one small portion reflected in any way upon Ms. Connell or any agreement. Where was her signature line? At the end of the document? Did it represent to the casual reader that she had signed something, that she knew what she was signing? Her signature was at the end of the document, and in light of Ms. Connell did ask eventually to see the entire document, and as I said, Ms. Soule did read the text of the entire document to Ms. Connell's attorney. So the county did not immediately want to give her the entire document for reasons that it included settlement amounts. Give me the timeline. When was that document read over the telephone to Ms. Connell's attorney? What date? Let me just make sure. That was the 12th. 12th of October. October 12th. When was she fired? Her termination was effective the 14th. She was fired on the 13th. Let me make sure I get my... When was the 8 o'clock meeting scheduled for that she did not appear? On the 13th. So on the 12th, the document is read over the telephone to her attorney, and that night, was it ever read to her? Well, I don't know what her attorney did. And was it read to the attorney in such a way that the attorney could sort of take notes of it, a transcript? It was over the telephone. So you didn't fax it to him? No. Ms. Connell was never given an actual full text copy of the agreement. She was informed that only one small paragraph referred to her. She was given that portion of the agreement. So you say to her, only this paragraph refers to you. The rest of the document has nothing to do with you. Trust us. But please sign at the end. Yes. Oh, my goodness. Why did you do that? You set up this problem. Well, ultimately, in our minds, that problem was resolved in that Ms. Soule, the county attorney, spoke directly to Ms. Connell's attorney, and they talked and exchanged. Are you referring to the October 12th? Yes, Your Honor. So you think that's resolving it to say, we want you to sign a document that you've never read that will read to your attorney over the telephone but won't fax to him, and we're going to fire you the next morning at 8 o'clock? That successfully takes care of the problem. Well, the problem being that Ms. Connell wanted to see the entire document? Well, you know, I had not focused until right now that she was being asked to sign at the end of the entire document, ostensibly indicating her agreement with the entire document, of which she's only been allowed to see a paragraph. Is that it, or was there some separate piece of paper that basically said, we want you to agree to play well with Mr. Grinnell? The entire settlement agreement was a separate matter. This was an attachment to the settlement agreement. Do we have in the record, and I confess I didn't bring my excerpts on the bench with me, do we have in the record a picture of the piece of paper that she was being asked to sign? Yes, Your Honor. It's Excerpt of the Record 7. Excerpt 7, okay. And the agreement is entitled Exhibit 1, Agreement of Cooperation. And that is... And it's a freestanding document. It's freestanding from the settlement claims that... Is she asked to sign at the end of the settlement? No, Your Honor. So she's only being asked to sign this freestanding paragraph. That's correct. Okay. Could you hand that up to the clerk? I don't have my excerpts in the record. That's what I was trying to figure out. Yeah. That was helpful. I would have said something like consequential to it. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Okay. Now, that helps straighten me out a little bit. Okay. Thank you, Your Honor. We also have a First Amendment claim which is alleged against Ms. Clausen in her individual capacity. The district court dismissed the claim finding that there was... primarily that any protected speech was a substantial motivating factor in the decision to terminate. So I argue, of course, that the speech was also not protected speech. But we can, you know, if we gloss right through that, we find also that there is no basically causation. And the main flashpoint of this can be aptly demonstrated when the plaintiff was asked during deposition, do you think that you were terminated for something that you said? And she replied, quote, I really couldn't say. I don't know. And that's at SER 101-54. So there is absolutely no evidence of retaliation. Further, there's no evidence that Ms. Clausen was even aware of any protected speech that was alleged by Ms. Connell. So without knowing of what the speech is, it is inconceivable that Ms. Clausen could be held individually liable for retaliating against something that she really had no idea of. Unless the court has some further questions, I'll just sum by requesting that this court uphold and affirm the findings of the district court. Thank you. Ms. Risberger, you've saved some time. How much time? It's less than a minute, but let's see what you have to say. Okay. We want to hold you to the 26 seconds. First of all, Your Honor, I'm not 100 percent positive of this, but I'm 99 percent positive that Agnes Soule did not read the entire agreement to Ms. Connell's attorney. She read only that portion of the settlement agreement that referred to Ms. Connell. But we're not talking about the Magna Carta here. The only agreement that she was being asked to sign was essentially I promise to work well with Mr. Grinnell, right? Hereafter. It's also part of a page that says settlement agreement and release at the bottom. This was a setup for Ms. Connell to give away her rights to file any bully complaint based on her complaints of gender discrimination. Releasing what, though? The document that she signed doesn't say what it is that she's releasing. But look at the context. Her claim was against Tom Grinnell for gender discrimination. It doesn't just infer. It screams that in the past they hadn't gotten along, and we're going to forget about all that and go forward from here. But I guess my question, and it's really a pretty simple one, is the document itself is pretty innocuous based on its language. I mean, all it says is that from this point on, I promise that I'll work well with Mr. Grinnell. I hear what you're saying about the fact that the word release would cause lawyers to freeze up, but there's nothing that then goes on to say what it is that's being released. If it's so innocuous, why was she terminated for not signing it? It just doesn't add up. Terminating an employee with an impeccable record. Asking two employees to promise that they'll make an effort to work well together does not seem to me to be an irrational request of a supervisor. And if an employee refuses to make that promise, I can certainly understand why that could be viewed as an act of insubordination. Now, maybe termination, as the hearing officer found, was too strong a sanction, but I don't see anything in that document now that I've read the language that, I mean, it seems to me that this is making a great deal out of very little in the document she was being asked to sign. I think that there's nobody in this room, Your Honor, that would sign a document, the third page of a document, without reading the entire document. She knew what was on that page, but she didn't know what was in the remainder of the document. I understand your point. I'd like to ask one question about the First Amendment. I'd like to get there, Your Honor. I used to think I knew something about the First Amendment, but I couldn't find anything in here that related to the First Amendment. Judge Hagerty didn't say anything about it. Well, he did, in fact, and the problem with what Judge Hagerty did is he did this. He said, There's no factual issue with respect to defendant's legitimate motivation in terminating plaintiff's employment. In other words, he found the substantial – he addressed the third prong of the First Amendment claim, that the expression is a substantially motivating factor for the adverse action by turning summary judgment on its head. That's exactly what he did. Well, what I want to know is what was the – what you claim was the violation of her First Amendment right, requiring her to sign something she hadn't read? Violation – What was her First Amendment grievance that was – She had a right to express concern about settlement agreements entered into with employees based on gender discrimination. She had a right to be free of retaliation based on her expression for the fear of her safety and Nedra Begley's safety. Was there – what was the evidence that she was fired for expressing concern about employment discrimination? For one, the timing. This all happened at the same time. Post Hoke, ergo broker Hoke. The terms of the settlement agreement, and to speak of Tom Grinnell, the fact that this was put in writing. I thought Judge Hagerty was throwing the case out of court because it – you didn't go – in the add-alls, you didn't go high enough up the food chain. He didn't – In the corporate and multiple county municipal. Actually, what he did, if I'm understanding your question, I think you're – if it is a question, I think you're saying he didn't – he didn't – he threw the case out because there was no expression? It wasn't a final decision maker. Oh, no. He got to the First Amendment issue as far as Claussen. Because, again, even if the policymaker prong isn't established, we still have a claim against Claussen based on the First Amendment. And the way he got rid of the First Amendment claim against Elise Claussen was to say, and I quote, there was no – and this is on summary judgment. There was no factual issue with respect to defendant's legitimate motivation in terminating plaintiff's employment. And I think Justice Fletcher indicated there's something weird about this. I don't know what word she used. There's something weird about this. How can there not be an issue of fact as to her motivation when we have evidence that the terms of a settlement agreement are not being disclosed in violation of a statute? And I cited in giving you the statute at page – Excerpt of Record 36 gives not just an employee but any member of the public the right to look at these settlement agreements. That is part of our public policy. And here the employee who has to sign the document isn't being allowed to read it. Well, it's a question of the document. I guess my – what she wants to know, or at least extensively what she wants to know, is there anything affecting my rights in the document to which this is an exhibit? And she's told no, and we are not going to show it to you. What do you do with the fact, if it is a fact, that the settlement agreement, which is not very long, just a couple of pages, was read to her attorney the morning before? Again, look at the timing of how that happened. It was read after the fact, after the decision was made. Because if you look at the record, what happened the day before she was terminated? The meeting was canceled. There was supposed to be a meeting on the 12th. She's told by Jim Rood, Ms. Connell is told, our attorneys are talking, so we don't need to have that meeting. That's what happened. What about the 8 a.m. meeting on the 13th, the one that she called in sick on? Well, she was sick. She was sick. And a meeting prior to that had already been canceled. Okay. Now, I'm not sure if you want to hear on the wrongful discharge claim. No, I think we're there. I think we're as confused as we're going to get. That's a penitent state law question, isn't it? Yes, it is. I've actually found the arguments on both sides very useful. It's a complicated and difficult case. So when I say we're as confused as we're going to get, that's facetious. That was not intended as a criticism. Thank you both for very helpful arguments. The case of Connell v. Multnomah County is now submitted for decision. And the last case on our morning calendar is Sticca v. Casarino for Ingray-Sticca.
judges: Goodwin, W. Fletcher, Tallman